# MICHAEL SCATENA *v.* JOHN G. ROWLAND ET AL.

Superior Court Judicial District of File No. CV00-0599020S
Hartford

Memorandum filed November 2, 2000

 

*Michael Scatena*, pro se, the plaintiff.

*Henri Alexandre*, assistant attorney general, with whom was *Richard Blumenthal*, attorney general, for the defendants.

## I

## INTRODUCTION

HON. RICHARD M. RITTENBAND, JUDGE TRIAL REFEREE. Michael Scatena, the plaintiff, is incarcerated at the Northern correctional institution (Northern) in Somers, a maximum security prison. He was transferred to that institution because, when he entered the Walker Reception Center in Suffield, he was found to have contraband, consisting of a stinger, which was hidden in his crotch. The stinger has been described by Major Thomas Coates, who is, among other things, in charge of intelligence at Northern, as an electrical type object which, if used, could damage the prison's electrical system. Further, the plaintiff has received 291 disciplinary tickets while in the Connecticut prison system. The plaintiff has brought this injunction action requesting first, that the court order the defendants

(aside from the named defendant, additional defendants are Northern's warden and other Northern officials) to provide him with nonrabbinical food and liquid staples that are free of the Jewish religious kosher food symbols known as "(U)" and "K" and, second, to provide him with a raw fruitarian diet (in the form of a vegetarian diet) as prescribed by the World Church of the Creator (World Church). In support of his motion for a temporary injunction, the plaintiff states that he is neither Jewish, nor does he wish to participate in any Jewish religious customs, such as being forced to consume food and liquid staples described in various exhibits, "along with the common fare or regular diet the department of correction [department] serves because they violate his religious beliefs as a member of the [World Church] and as a former Mormon." The present case came before the court for a hearing on October 26, 2000, at which the plaintiff appeared and was heard as a pro se litigant; the defendant prison officials also appeared and were represented by assistant attorney general Henri Alexandre.

The court heard testimony from the plaintiff, Robert Deveau, director of food services for the department, Father Anthony J. Bruno, director of religion at Northern, and the aforementioned Coates.

As a preliminary matter, the court notes that it refused to issue subpoenas for three witnesses requested by the plaintiff, Carnell Hunnicut, Eric Atkinson and Francis Anderson, who are other prisoners at Northern. The court refused to issue subpoenas for these three witnesses partly based upon the state's objection on the ground that their production would create a serious safety and security problem at Northern. They are incarcerated at Northern because of their chronic disciplinary history and potential for violence. If, at some future

proceeding, it is necessary to have these men as witnesses, the court will have them appear by teleconferencing. Their presence is found to be unnecessary, however, because the court will concede that these witnesses, all of whom are African-Americans, will testify that the plaintiff's religion is not a threat to them. The court finds such testimony irrelevant, however, because it does not address the issues pertaining to the motion for a temporary injunction. The court has already ruled in *Barletta* v. *Myers*, Superior Court, judicial district of Hartford, Docket No. CV000596675S (October 27, 2000) (*Rittenband, J. T. R.*), that the warden of Northern is not required to provide prisoners with the White Man's Bible and other white supremacist documents on the basis of testimony from prison officials in *Barletta* that such documents would be inflammatory and endanger the security of other inmates and the prison. The *Barletta* court found this to be a legitimate penological interest, which took precedence over the claimed constitutional violation of the inmates' religious rights. Further, the plaintiff's motion for a temporary injunction in the present case does not concern itself with the delivery of this literature.

As a further preliminary matter, it is well settled law in Connecticut that a plaintiff is entitled to a preliminary or temporary injunction only if that plaintiff proves a reasonable likelihood of success on the merits and irreparable harm to him if the injunction is not issued. *Branch* v. *Occhionero*, 239 Conn. 199, 207, 681 A.2d 306 (1996); *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 458, 493 A.2d 229 (1985).

## II

### ISSUES

The first issue relevant to the plaintiff's motion for a temporary injunction is whether the World Church is a religion. Father Bruno testified that he had been

unable to find, after a thorough search, any documents that would indicate conclusively that the World Church is a religion. Further, he could not find it listed with the Internal Revenue Service as an eleemosynary/charitable institution within the exemptions provided under 26 U.S.C. § 501 (c) (3) of the Internal Revenue Code. The plaintiff introduced as an exhibit an affidavit from "Reverend" Matthew Hale, the leader of the World Church, indicating that the World Church had been approved under 26 U.S.C. § 501 (c) (3). The court finds, however, that there is no specific definition of a religion that would exclude the World Church. The court is well aware of the major religions, Protestantism, Catholicism, Judaism, Islam, Buddhism and the like. The court is also aware that an individual can simply declare oneself a minister, choose a title for his religion, and solicit members. Under our laws, there is no prohibition against such a creation calling itself a religion. The court, therefore, for the purposes of this motion, is willing to accept the World Church as a "religion," no matter how racist and abhorrent the principles of that religion may be. Further, the court is also willing to accept that being required to eat foods approved for kosher could be a violation of such religion because, as it states on page 401 of the White Man's Bible: "3. As the White Race becomes united, informed and aroused we will boycott every Jew and every aspect of Jewish influence in our society."

The court has admitted the following plaintiff's exhibits. Exhibit one. Labels of condiments served to all prisoners, which include ketchup, mustard, mayonnaise and SIGM 4, which is claimed to be pancake syrup, all of which have the religious symbol with the "U" in a circle, designating that the condiments are approved for kosher. Exhibit two. Guida's brand orange drink with the same symbol. Exhibit three. Ralston Foods brand Crispy Rice Cereal with the symbol "K" which,

allegedly, is indicative of approval for kosher. Exhibit four. Ralston Foods brand Cornflakes with a "K." Exhibit five. Guida's orange juice with one of these symbols. Exhibit six. Guida's milk with one of these symbols. Exhibit seven. Wachusett brand potato chips with one of these symbols. Exhibit seventeen. Guida's chocolate milk, which does not appear to have such a symbol.

The court pointed out to the plaintiff that water, fruits and vegetables are all approved for kosher, although they are not so labeled. The court became aware of this from its own research and takes judicial notice of the same. The court then asked the plaintiff that, if he were biased against Italians, would he then refuse to eat pasta. He answered in the affirmative. The plaintiff appears to object to those items with the aforementioned labels on them but considers water, fruits, vegetables and the like, not to be approved for kosher because there is no label on them. He is perfectly willing to drink water and eat fruits and vegetables. The plaintiff's exhibit fourteen is a reprint of definitions from Webster's Ninth New Collegiate Dictionary (1991), which define kosher as "sanctioned by Jewish law; esp.: ritually fit for use . . . selling or serving food ritually fit according to Jewish law." The plaintiff claims that these food items were, therefore, "blessed." The court finds that it does not mean that these foods are necessarily "blessed."

The court concludes on this issue that, even though the plaintiff will eat foods the court has described to him as having being approved for kosher, namely water, fruits and vegetables, he still maintains that what is kosher are only those foods with the aforementioned labels on them. This is simplistic reasoning and has no merit. As for the food items with the aforementioned labels that are approved for kosher, however, the court does find that to require the plaintiff to eat such labeled

foods is a violation of his religious principles. The remedy for the plaintiff is simply, "Don't eat or drink such foods."

It should be noted that whether the plaintiff adheres to these principles because of the religious rights he claims under the World Church is open to question. The plaintiff stated that he was a vegetarian from 1995 until March, 2000, because during that period he was a member of the Mormon faith. According to the defendants' exhibit D of Religious Beliefs and Practices of the Church of Jesus Christ of Latter Day Saints (Mormon), a vegetarian diet is not required. The handbook mentioned in exhibit D states in pertinent part: "Latter-day Saints eat meat sparingly, encourage the use of wholesome herbs, fruits and grains and totally abstain from the use of tea and coffee, tobacco, alcohol and drugs." This is further described in the same terms in the defendants' exhibit E, which is a description of the Mormon Church from the Handbook for United States Army Chaplains. Thus, the plaintiff adopted a vegetarian diet, even though it was not mandated by the Mormon religion.

## III

## IRREPARABLE HARM

Deveau, director of food services for the department, testified that the common fare diet is meatless, but does provide 2700 to 2800 calories per day, which clearly meets the recommended daily allowance for nutritional purposes. The common fare diet has been described by Father Bruno as meeting all nutritional needs, without the presence of food items forbidden by religious dogma. Pursuant to the plaintiff's exhibit nine, however, which is the affidavit from the leader of the World Church, the plaintiff is limited in his diet. The affidavit mentioned in exhibit nine states in pertinent part: "4. That in order to fully practice our Faith, adherents must

practice a fruitarian diet; namely, adherents must only consume raw fruits, vegetables, nuts, and seeds in their natural, unprocessed state. Deveau stated that, by following the common fare diet but eliminating such foods as fish, meat and other items, the plaintiff would be able to maintain a proper level of nutrition in his consumption of food if he added peanut butter and jelly to his meals. Deveau testified that peanut butter and jelly could be substituted for milk, eggs and fish. He stated that the department does not offer a vegetarian diet. He further stated that he could provide peanut butter and jelly as part of the diet, which would be sufficient, but, in order to do so, he would need approval from the commissioner of correction. Deveau indicated that this could create a problem in distribution if more inmates were to request the same. This may not be a problem because, according to Father Bruno, only two members of the World Church are in the prison system, namely, John Barletta and the plaintiff.

The defendants' exhibit A shows purchases by the plaintiff from the prison commissary of peanut butter and grape jelly as well as a lemon drink and candy on September 12, 2000, peanut butter and jelly on September 19 and September 25, 2000, and, on October 2, 2000, peanut butter, jelly, fruit punch, candy, hot sauce, saltines, honey buns and chocolate chip cookies. On October 10, 2000, he purchased peanut butter and on October 16, 2000, he purchased peanut butter, saltines and chocolate chip cookies. Therefore, the addition of peanut butter and jelly, which both the plaintiff and Deveau stated would be sufficient for the former's diet, even if he were to discard items that did not fit in with his religious principles, would meet the plaintiff's daily nutritional requirements. From this exhibit, it is clear that he has peanut butter and jelly available to him from the commissary. The plaintiff claims that there are times when, because of disciplinary reasons, he is prohibited

from using the commissary.[1] Of course, he is the individual who is responsible for his own disciplinary problems, and he should not present disciplinary problems if he wants to obtain the peanut butter and jelly from the commissary. The plaintiff is expected to be released from prison on June 6, 2001, and it would appear to this court that he should be able to avoid the loss of commissary privileges between now and then.

## IV

## CONCLUSION

Accordingly, by being able to supplement his diet with peanut butter and jelly, which is readily available to him, the plaintiff will be able to adhere to his "religious" principles and still maintain a sufficiently nutritional diet.

For that reason, the plaintiff has failed to show that he will suffer irreparable harm under the circumstances. The plaintiff's motion for a temporary injunction, therefore, is denied.

---

[1] The plaintiff testified that he lost his commissary privileges a month ago, yet he was still able to buy items at the commissary in October. This evidence is contradictory, and brings into question the plaintiff's credibility.